**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTOPHER HUGE,** | : | **Civil No. 3:16-CV-641** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **CAROLYN W. COLVIN** | : | |
| **Acting Commissioner of Social** | : | |
| **Security,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

One unique feature of Social Security litigation is the very deferential standard of review which applies to Social Security appeals. On appeal, this Court's review is limited to determining whether the findings of the Administrative Law Judge are supported by substantial evidence in the record. See 42 U.S.C. §405(g); 42 U.S.C. §1383(c)(3); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).

1

Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971).

Given this very deferential standard of review, which is satisfied by less than a preponderance of the evidence but more than a scintilla, we are obliged to affirm agency determinations denying disability benefits whenever the factual record reveals the existence of such relevant evidence as a reasonable mind might accept as adequate to support the agency's conclusion, even if that evidence may well also have supported a contrary conclusion had it been construed in a different light. Mindful of this deferential standard of review, for the reasons set forth below, we will AFFIRM the decision of the Commissioner in this case because we conclude that the ALJ's findings are supported by substantial evidence which was sufficiently articulated by the agency decision-maker.

## II.     Statement of Facts and of the Case

The case of Christopher Huge came to be heard by an ALJ based upon an extensive, but often equivocal, medical and factual record. Huge applied for disability insurance benefits on August 15, 2015, alleging that he had been disabled since November 30, 2013, due to the combined effects of various cervical spine ailments, left hand weakness and sensory change, left arm pain, left hip pain, and depression. (Tr. 155, 172.) Huge was an older worker, in his early 50s, at the

time of this disability application.  He had completed high school, attended vo-tech school for auto body training, and had a significant past relevant work history as a general foreman in the tree service industry.  (Tr. 60, 73, 95, 200, 353.)

With respect to Huge's disability application, in rendering a decision on this application the ALJ was obliged to consider:  (1) the credibility of Huge and his wife, both of whom described the limitations that he was experiencing as a result of these various impairments; (2) Huge's reported activities of daily living; (3) contemporaneous medical treatment and examination records documenting the medical care Huge received during this period of claimed disability; and (4) various medical opinions regarding the degree to which Huge's physical and emotional impairments were wholly disabling.  As described below, these various evidentiary threads lent themselves to competing and contradictory conclusions concerning the extent to which Huge's physical and emotional conditions precluded him from undertaking any gainful employment.  This mixed and equivocal evidence is discussed separately below.

### A. Huge's Reported Limitations and Self-Described Activities of Daily Living

In the course of these administrative proceedings, both Huge and his wife described the combined effects of the plaintiff's physical and emotional impairments in terms that were completely disabling.  However, other accounts

given by Huge regarding his activities of daily living indicated a greater capacity for gainful activity. For example, during a November 2014, examination Huge reported that he was able to dress, bathe, and groom himself seven times a week, although he had trouble with buttons and tying shoes. (Tr. 355.) He was also able to cook and prepare simple meals, clean, do laundry, shop, manage money, and drive. (Tr. 355.) He socialized with family on a regular basis. (Tr. 355.) According to Huge his hobbies and interests included fishing, walking in the woods, and watching television. (Tr. 356.)

Huge also completed an Adult Function Report in September of 2014. In this report Huge described the impairments caused by pain, discomfort, numbness and loss of grip and sensation in his left hand, arm and hip. (Tr. 217-222.) Huge stated that these impairments, and particularly the weakness in his left hand, made it difficult for him to perform many personal care and grooming activities. (Id.) However, in this report Huge stated that he did not need special reminders to take care of personal needs or take medicine. (Tr. 218.) He prepared simple meals and occasionally did tasks like laundry and touch up painting. (Tr. 218.) Huge also reported that he drove occasionally, or would walk when he went out. (Tr. 219.) According to Huge, he was able to shop in stores for fishing tackle and worms, and would try to go fishing or do artwork a "couple of times" a week. (Tr. 220.) In

addition, Huge reported that he would frequent to flea markets or yard sales, attending such events two to three times a week. (Tr. 220.) Huge also was able to handle an array personal finance activities in a fashion which suggested that his mental acuity was not severely impairment. Thus, Huge stated that he was able to pay bills, count change, and handle a savings account. (Tr. 219.) He did not need to be reminded to go places, and he did not need someone to accompany him when he went places. (Tr. 220.) Huge also asserted that his ability to pay attention was unlimited, and he had no problems following written instructions, following spoken instructions, or getting along with authority figures. (Tr. 221-22.)

**B. Huge's Medical Treatment History**

During the relevant period encompassed by this disability application, Huge sought and received medical care from a variety of treating sources. In fact, it appears that between 2014 and 2015 as many of nine different treating sources may have provided clinical encounters, examinations, and treatments to Huge. The contemporaneous treatment records of these health care providers confirmed that Huge was suffering from cervical spinal conditions which left him with some impairment of his left arm, as well as pain in his left hip. Furthermore, these records confirmed that Huge experienced periodic depressions. However, these clinical records were also notable in that the examination results that were

independently obtained from multiple medical sources did not confirm a completely disabling level of impairment.

For example, during the Spring and Summer of 2014 Huge twice visited a hospital emergency room complaining of neck and arm pain and numbness. At the outset, on March 24, 2014, Huge sought emergency room treatment complaining of intermittent hand and arm numbness. (Tr. 294.) A neurological evaluation, including MRI and MRA of the head and neck revealed cervical neck disease, specifically bulging discs and canal stenosis. (Tr. 292.) Huge was treated with steroids and pain medication, and discharged home the following day in stable condition. (Tr. 292.) Four months later, on July 19, 2014, Huge again reported to the emergency room with complaints of neck pain radiating to his left arm. (Tr. 306-07.) Examination of the left army revealed decreased sensation to light touch, decreased grip strength, normal finger abduction/adduction, normal wrist flexion and extension, normal proximal strength, and full range of motion in all extremities. (Tr. 308.) A psychiatric examination of Huge conducted at this time revealed that his mood and affect were normal. (Tr. 309.)

On-going care and treatment of Huge by a number of independent medical providers in the Fall of 2014 provided some further confirmation of left side pain and weakness for Huge, but also documented that Huge retained substantial

physical capabilities despite these impairments. For example, on September 23, 2014, Steven Gold, M.D., a physician associated with St. Luke's University Health Network, saw Huge for an initial visit and transfer of care. (Tr. 323-25.) At that time Huge denied limb weakness, (Tr. 324.), a physical examination was essentially normal, and a psychiatric examination revealed that his mood and affect were also normal. (Tr. 325.)

One month later, on October 13, 2014, Jason Smith, M.D., a neurologist, saw Huge regarding his complaints of neck and upper back pain. (Tr. 236, 330.) At that time a physical examination of Huge revealed that his sensation was intact to light touch in the bilateral upper extremities (Tr. 330.); Huge's motor strength was 5/5 in all muscle groups except for 3/5 finger flexors and 3/5 small finger abduction on his left hand. (Tr. 330.) Dr. Smith diagnosed Huge as suffering from cervical radiculopathy, cervical spine degeneration, and cervical herniation, and recommended a conservative course of treatment, cervical epidural steroid injections. (Tr. 330.)

One month later, on November 11, 2014, a third medical source, Rafay Ahmed, M.D., performed a consultative physical examination of Huge. (Tr. 335-38.) At this time Huge complained of numbness in his left arm, neck pain, tingling and burning sensations in his left hand, decreased dexterity of the left hand as of

March 2014, and hip pain as of March 2014.  (Tr. 335.)  While Huge stated that he used a cane, medical notes disclosed that he did not present to the examination with a cane.  (Tr. 335.)  Upon examination, Dr. Ahmed observed that Huge was right-handed, and that his gait was normal.  (Tr. 336.)  He could heel and toe walk without difficulty, he could fully squat, his stance was normal, he used no assistive devices, he needed no help changing for the exam or getting on and off the exam table, and he was able to rise from a chair without difficulty.  (Id.)  A musculoskeletal examination revealed no scoliosis or abnormality in the thoracic spine; negative straight leg raising bilaterally; no evident joint deformity; as well as stable and nontender joints.  (Tr. 337.)  A neurologic examination disclosed that deep tendon reflexes were normal and equal in the upper and lower extremities, decreased sensation to pinprick and soft touch on the ulnar aspect of the left hand, 5/5 strength in the right arm and both legs, and 4/5 strength in the left arm.  (Tr. 337.)  Dr. Ahmed found no muscle atrophy  and  examination of the Huge's hands revealed that right hand finger dexterity was intact, grip strength was 5/5 on the right, but left hand dexterity was decreased, and grip strength was 4/5 in the left hand.  (Tr. 337.)  Although the ability to button and pick up a coin with the left hand was decreased and Huge could not make a fist, he was able to cook twice a week, clean, do laundry twice a week, and shower, bathe and dress himself every

day. (Tr. 336.) Dr. Ahmed diagnosed Huge as suffering from left hand numbness and tingling associated with decreased left hand dexterity and grip strength. (Tr. 338.)

Treatment records for Huge documenting care he received throughout 2015 continued to confirm some degree of impairment, but failed to document fully disabling medical conditions. Thus, Mark Powell, M.D., a physician at St. Luke's University Health Network, provided routine medical care for Huge from November 2014 through August 2015. (Tr. 363-74, 460-67.) During this time, Dr. Powell confirmed diagnoses of spinal degeneration and herniation, gout, depression, and anxiety for Huge. (Tr. 363, 366, 369, 372, 460, 464.) However, despite these diagnoses, in December 2014, Dr. Powell described Huge's depression was asymptomatic. (Tr. 369.) In January 2015, Dr. Powell performed a limited physical examination of Huge which found that his cranial nerves were intact, reflexes were symmetric, and his mood and affect were normal. (Tr. 367-68.)

On February 24, 2015, John Denny, M.D., a neurologist, consulted with Huge to discuss treatment options for his cervical spinal conditions. (Tr. 473.) At that time a physical examination of Huge confirmed weakness in his left arm and some decreased sensation, but disclosed normal coordination, no atrophy, and no

abnormal movements.  (Tr. 475.)  Huge also demonstrated normal memory, thought processes, attention span, mood, and affect.  (Tr. 475-76.)

Dr. Denny ordered an MRI of the cervical spine, which was conducted on March 10, 2015.  (Tr. 361-62.)  This MRI showed degenerative disease resulting in mild to moderate stenosis of several cervical vertebrae, findings which were similar to a prior MRI.  (Tr. 362.)  On March 16, 2015, Dr. Denny reviewed an EMG study which reflected moderate to severe carpal tunnel syndrome, a condition which appeared more severe on Huge's left hand and wrist.  (Tr. 385.)  Dr. Denny referred Huge to a neurosurgeon for possible carpel tunnel surgery.  (Tr. 385.)

Three weeks later, on April 8, 2015, Doron Rabin, M.D., a neurosurgeon, saw Huge regarding his complaints of arm and neck pain, and weakness in his left hand.  (Tr. 446.)  The reported results of this clinical encounter were largely unremarkable.  Huge denied any difficulties with handwriting or gait.  (Tr. 447.)  Further, Dr. Rabin noted that Huge had declined cervical epidural steroid injections, and had not tried physical therapy.  (Tr. 447.)  After performing a physical examination of Huge and reviewing the results of his recent MRI and EMG tests, Dr. Rabin opined that neck surgery was not necessarily recommended.

(Tr. 446.)  Huge, however, was interested in discussing carpal tunnel release, and so Dr. Rabin referred him to another neurosurgeon for a second opinion.  (Tr. 446.)

That second consultation took place one week later, on April 16, 2015, when Dang Zhang, M.D., a neurosurgeon, performed a physical examination of Huge. This examination confirmed some pain and nerve impingement affecting Huge's left arm, a moderately limited cervical range of motion, 4/5 left grip strength and wrist extension, 5/5 muscle strength in all other areas, grossly intact sensation and deep tendon reflexes, and a normal gait.  (Tr. 429.)  Based upon these clinical findings, Dr. Zhang recommended conservative options for Huge, including physical therapy, epidural steroid injections, and medication before pursuing surgery. (Tr. 426.)

Treatment notes provided to the agency following the initial ALJ decision documenting treatment received by Huge from a physician assistant on June 24, 2015, further corroborated that Huge did not regard these cervical and left arm issues as wholly disabling.  In fact, Huge reported that that time that he was not interested in neck surgery, was having second thoughts about carpal tunnel surgery on his left wrist, and was able to operate a motorcycle, using wrist splints.  (Tr. 478.)  Finally, On August 19, 2015, Dr. Powell saw Huge for a cold and discussion of disability paperwork.  (Tr. 460.)  At that time Huge stated that his depression

11

had improved, (Tr. 460.), and a physical examination of Huge resulted in findings were largely normal. (Tr. 462.)

## C. **Opinion Evidence**

Finally, consistent with the mixed and equivocal quality of the other evidence that was before the ALJ, the record in this case was marked by divergent opinion evidence, which argued in favor of contrary conclusions on this disability claim.

Turning first to the opinion evidence relating to Huge's mental state, three sources have opined on this issue, reaching contrasting conclusions. First, at the outset of the agency review process, on November 26, 2014, John Rohar, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form and a mental RFC assessment for the plaintiff based on his review of Huge's medical records. (Tr. 163-64,168-69.) In these assessments Dr. Rohar found that Huge had affective and anxiety related disorders that resulted in mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, but had resulted in no repeated episodes of decompensation, each of extended duration. (Tr. 163.) Dr. Rohar also concluded that Huge had no limitations in the areas of understanding and memory; concentration, persistence, and pace; and social

interaction.  (Tr. 168.)  In the area of adaptation, Dr. Rohar found no significant limitations in Huge's ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others; and moderate limitations in his ability to respond appropriately to changes in the work setting.  (Tr. 168.)  Dr. Rohar found that despite the limitations resulting from Huge's emotional impairments, he had the mental residual capacity to perform the basic mental demands of competitive work on a sustained basis.  (Tr. 168.)

In November of 2014 Gregory Coleman, Psy.D., performed a consultative psychiatric evaluation of Huge.  (Tr. 353-57.)  While Huge reported past episodes of suicidal ideation, at the time of this examination he was cooperative, appropriately dressed, well-groomed, and fully oriented to person, place, and time.  (Tr. 354-55.)   His motor behavior was normal; eye contact was appropriate; thought processes were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia; his attention and concentration were intact; and while his recent and remote memory skills were mildly impaired due to anxiety Huge's intellectual functioning was in the average range and his insight and judgment were determined to be good.  (Tr. 355.)  Huge reported that he was able to dress, bathe, and groom himself seven times a week, although he had

trouble with buttons and tying shoes. (Tr. 355.) He was also able to cook and prepare simple meals, clean, do laundry, shop, manage money, and drive. (Tr. 355.) He socialized with family on a regular basis. (Tr. 355.) His hobbies and interests included fishing, walking in the woods, and television. (Tr. 356.) Dr. Coleman opined that "[t]he results of the examination appear to be consistent with psychiatric problems, but in itself, this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (Tr. 356.) Thus, Dr. Coleman found that Huge's ability to understand, remember, and carry out instructions was not affected by his impairment, concluded that there was no impairment in Huge's ability to interact appropriately with the public, supervisors, and coworkers, and found only moderate limitation in his ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 357-59.)

In contrast to these relatively benign mental health findings, Paul Boggia, a Social Worker who had been counseling Huge in 2014 opined on two occasions that his emotional impairments were extreme and wholly disabling. (Tr. 389-94.) Mr. Boggia's opinions, while internally consistent, rested upon an enigmatic foundation since Boggia stated that Huge's emotional impairments stemmed from March 2014 auto accident, but there is no indication of any such accident in any of

Huge's medical records, and Huge specifically denied being in an auto accident in March of 2014 at the time of his ALJ hearing. (Tr. 82.)

Likewise, opinions regarding the disabling effects of Huge's physical impairments were varied and contrasting. For example, on July 24, 2014, an individual associated with Huge's primary care provider, St. Luke's Family Practice – Huge completed a form for the Pennsylvania Department of Public Welfare. (Tr. 312-13.) This form indicated that Huge would be "temporarily disabled" for 12 months or more due to cervical radiculopathy with left arm pain and numbness, and cervical spine stenosis. (Tr. 313.)

Four months later, on November 19, 2014, at the outset of the agency administrative process a second medical opinion was issued by a state agency physician, Elizabeth Kamenar, M.D., performed a physical residual functional capacity (RFC) assessment based of Huge on her review of his medical records. (Tr. 164-67.) Dr. Kamenar found that Huge could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for a total of about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, but would need to avoid repetitive pushing or pulling with his left arm. (Tr. 165.) The doctor also found that Huge could climb ramps and stairs, balance, stoop, kneel, crouch, and crawl occasionally, but could never climb ladders, ropes or scaffolds,

and was limited in his ability to reach, handle, finger, and feel with his left arm and hand.  (Tr. 165.)  Dr. Kamenar further concluded that Huge would need to avoid concentrated exposure to extreme cold, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights.  (Tr. 166-67.)  In reaching these results the doctor relied both upon Huge's medical records and his self-reported physical activities.  Dr. Kamenar noted that despite Huge's complaints of pain and decreased left hand function, he prepared meals, walked on a daily basis, did laundry, did paint touchups, drove, shopped, went fishing with assistance, went to flea markets and yard sales, and could walk "a couple hundred yards."  (Tr. 167.)

On August 19, 2015, another medical opinion regarding Huge's impairment was prepared by Dr. Powell at St. Luke's.  The doctor prepared this report at Huge's request after Huge had made an appointment to see Dr. Powell regarding a cold and to discuss disability paperwork.  (Tr. 460.)  During this appointment, Huge stated that his depression had improved and Dr. Powell's physical examination findings were largely normal.  (Tr. 462.)  Nonetheless, Dr. Powell completed a Medical Opinion Re: Ability To Do Work-Related Activities (Physical) form  for Huge, (Tr. 395-98.), in which he found that Huge could lift and carry less than 10 pounds frequently and occasionally, stand and walk for

about 4 hours during an 8-hour workday, and sit for less than 2 hours in an 8-hour workday. (Tr. 395.) Dr. Powell also found that Huge could occasionally stoop, crouch, and climb stairs but could never twist or climb ladders; and would need to avoid concentrated exposure to extreme cold and heat, wetness, humidity, and noise, moderate exposure to fumes, odors, dusts, gases, and poor ventilation, and all exposure to hazards such as machinery and heights. (Tr. 397-98.) Dr. Powell further concluded that reaching, handling, and pushing or pulling were affected by Huge's impairment, but that fingering, fine manipulation and feeling were not affected by his impairments. (Tr. 397.)

### D.     **Agency Administrative Proceedings**

It was against this medical and factual backdrop marked by contrasting, competing, and equivocal medical evidence that the ALJ conducted a hearing into Huge's disability application on October 22, 2015. (Tr. 67-102.) Huge testified at this hearing, along with a vocational expert who stated in response to hypothetical questions posed by the ALJ that there were a number of light exertional work jobs in the regional economy that a person suffering from conditions similar to those experienced by the plaintiff could perform. (Id.)

On November 2, 2015, the ALJ issued a decision denying Huge's claim for disability benefits. (Tr. 45-62.) In this decision, the ALJ first found at Step 1 of

17

the five-step sequential process that applies to disability claims that Huge had met the insured status requirements of the Social Security Act. (Tr. 50.) At Step 2 of this sequential analysis process, the ALJ concluded that Huge had the following severe impairments: cervical disc disease, depressive and anxiety disorders and carpel tunnel syndrome. (Tr. 50.) At Steps 3 and 4 of this sequential analysis, the ALJ concluded that none of Huge's impairments met a listing which would define him as *per se* disabled, (Tr. 51.), and determined that Huge could not return to his past relevant work as a tree surgeon. (Tr. 60.)

The ALJ then concluded that Huge retained the residual functional capacity to perform a limited range of light work. Specifically, the ALJ found that:

> After careful consideration of the entire record, . . . the claimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b). He can occasionally push/pull with the left upper extremity. He can frequently push/pull with the right upper extremity. He can occasionally balance, stoop, crouch. Crawl, kneel, and climb, but never on ladders, ropes, or scaffolds. He can occasionally reach overhead with the left upper extremity and occasionally engage in fingering. feeling, and fine manipulation. He can occasionally handle and perform gross manipulation with the left upper extremity. There are no such limitations with the right, upper. dominant extremity. He should avoid concentrated exposure to temperature extremes of cold, wetness, humidity, vibrations, and hazards, including moving machinery and unprotected heights. He can do simple, routine tasks, no complex tasks, in a low stress work environment, defined as occasional decision-milking and occasional changes in the work setting. He can have occasional interaction with the public.

(Tr. 53.)

In reaching this residual functional capacity assessment, the ALJ carefully detailed Huge's medical treatment history, describing the contrasting and often equivocal findings of the nine medical sources that had treated and examined him, or considered his case. (Tr. 53-60.) As the ALJ observed that these medical source treatment records confirmed that Huge suffered from some cervical and emotional impairments, but this objective clinical data collected by these treating sources seemed to generally confirm that he retained the ability to perform some light work. (Id.) The ALJ also noted the conservative course of treatment afforded Huge for these conditions, a level of treatment which was not consistent with wholly disabling impairments. (Id.)

In addition, the ALJ weighed the claims of disability described by Huge and his wife against the plaintiff's self-reported activities of daily living. On this score, the ALJ concluded that Huge's description of his limitations and his wife's reports were not entirely credible since they conflicted with objective medical date, some medical opinions, and Huge's own self-reported activities. (Id.)

Finally, the ALJ examined the conflicting medical opinion evidence in this case, and determined on balance that those opinions which suggested that Huge was capable of a limited range of light work were more consistent with the clinical

data and Huge's self-described activities. (Id.) Finding that these medical opinions drew greater support from the objective medical record, the ALJ afforded greater weight to those opinions that found that Huge retained the capacity to perform some work. Having conducted this analysis, and found that the medical evidence supported a conclusion that Huge could perform a limited range of light work, the ALJ concluded that there were a significant numbers of jobs in the regional economy that Huge could perform. (Tr. 61.) Accordingly, the ALJ found that Huge was not disabled, and denied his application for disability benefits. (Tr. 62.)

Huge's appealed this decision to the Appeals Council. In connection with this agency appeal, Huge tendered additional medical records to the Appeals Council including treatment notes from a physician assistant on June 24, 2015, documenting an encounter in which Huge reported that that time that he was not interested in neck surgery, was having second thoughts about carpal tunnel surgery on his left wrist, and was able to operate a motorcycle, using wrist splints. (Tr. 478.) The Appeals Council found this additional evidence unpersuasive, and affirmed the decision of the ALJ.

This appeal followed.  This matter has been fully briefed by the parties, and is now ripe for resolution.  For the reasons set forth below, we will AFFIRM the decision of the Commissioner.

A. **Substantial Evidence Review – the Role of the Administrative Law Judge and the Court**

Resolution of the instant social security appeal involves an informed consideration of the respective roles of two adjudicators–the Administrative Law Judge (ALJ) and this Court.  At the outset, it is the responsibility of the ALJ in the first instance to determine whether a claimant has met the statutory prerequisites for entitlement to benefits.  To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §416.905(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §416.905(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents

him or her in engaging in any of his or her past relevant work. 42 U.S.C. §1382c(a)(3)(H)(i)(incorporating 42 U.S.C. §423(d)(5) by reference); 20 C.F.R. §416.912; <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).

Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §416.912(f); <u>Mason</u>, 994 F.2d at 1064.

Once the ALJ has made a disability determination, it is then the responsibility of this Court to independently review that finding. In undertaking this task, this Court applies a specific, well-settled and carefully articulated standard of review. In an action under 42 U.S.C. § 405(g) to review the decision of the Commissioner of Social Security denying plaintiff's claim for disability benefits, Congress has specifically provided that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). Thus, when reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. <u>See</u> 42 U.S.C.

§405(g); 42 U.S.C. §1383(c)(3); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F.Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).

But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether a plaintiff is disabled, but whether the Commissioner's finding that he is not disabled is supported by

24

substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

The ALJ's disability determination must also meet certain basic substantive requisites.  Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination.  Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981).  Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is

25

relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999). Moreover, in conducting this review we are cautioned that "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir.1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.')." Frazier v. Apfel, No. 99-715, 2000 WL 288246, *9 (E.D. Pa. March 7, 2000). Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

## B. Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence

Social Security appeals frequently entail review of an Administrative Law Judge's evaluation of competing medical evidence. This evaluation is conducted pursuant to clearly defined legal benchmarks. The Commissioner's regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and

prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions. 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In deciding what weight to accord to competing medical opinions, the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and, therefore, their opinions may be entitled to significant weight. See 20 C.F.R. §404.1527(c) (2) ("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record). However, it is also clear that treating physician opinions do not control

this determination. State agency doctors are also entitled to have their opinions given careful consideration. As the court of appeals has observed:

> "[t]he law is clear ... that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity," Brown v. Astrue, 649 F.3d 193, 197 n. 2 (3d Cir.2011). State agent opinions merit significant consideration as well. See SSR 96–6p ("Because State agency medical and psychological consultants ... are experts in the Social Security disability programs ... 20 C.F.R. §§ 404.1527(f) and 416.927(f) require [ALJs] ... to consider their findings of fact about the nature and severity of an individual's impairment(s)....").

Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c).

Oftentimes an ALJ must evaluate a number of medical opinions tendered by both treating and non-treating sources. Judicial review of this aspect of ALJ decision-making is guided by several settled legal tenets. First, when presented

with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011). Thus, "[w]here, . . . , the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' " <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions deserve greater weight.

In making this assessment of medical opinion evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. <u>See</u> <u>Thackara v. Colvin</u>, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D.Pa. Mar. 23, 2015); <u>Turner v. Colvin</u>, 964 F.Supp.2d 21, 29 (D.D.C.2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); <u>Connors v. Astrue</u>, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. <u>See e.g.</u>, <u>Thackara v. Colvin</u>, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D.Pa. Mar. 23, 2015).

<u>Durden v. Colvin</u>, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).

Moreover, in determining the weight to be given to a medical source opinion, it is also well-settled that an ALJ may discount such an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the source's medical opinion, and the doctor's actual treatment notes, justifies giving a medical source opinion little weight in a disability analysis. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). Additionally, "an opinion from a [medical] source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." Tilton v. Colvin, 184 F. Supp. 3d 135, 145 (M.D. Pa. 2016).

Finally, it is important to note that the regulations in existence at the time of this ALJ hearing drew a distinction between opinions from acceptable medical sources, and other opinion evidence, and afforded greater weight to acceptable medical source opinions. In this case:

> The distinction between "acceptable medical sources" and "other sources" is important because only acceptable medical sources can be considered treating sources and accorded great or controlling weight. *See* 20 C.F.R. § 416.927(c). Acceptable medical sources include licensed physicians, licensed psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. *See*

20 C.F.R. §§ 416.913(a), 416.913(a). Medical sources not listed as an acceptable medical source are considered "other sources." 20 C.F.R. § 416.913(d)(1). Licensed clinical social workers, therapists, public and private social welfare agency personnel, and rehabilitation counselors are not acceptable medical sources. SSR 06–03p; see also 20 C.F.R. § 416.913(d).

Mack v. Astrue, 918 F. Supp. 2d 975, 982 (N.D. Cal. 2013).

## C. Claimant Credibility Analysis

Social Security appeals also often entail review of an Administrative Law Judge's assessment of both claimant and witness credibility. On this score, it is well-settled that, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir.1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.')." Frazier v. Apfel, No. 99-715, 2000 WL 288246, *9 (E.D. Pa. March 7, 2000). In order to aid ALJs in this task of assessing claimant credibility Social Security Rulings and Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529; SSR 96–7p. First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such

symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 404.1529(b); SSR 96–7p. During this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c); SSR 96–7p. This includes, but is not limited to: medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. § § 404.1529(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other

factors concerning the claimant's functional limitations and restrictions.  Id. See George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D.Pa. Oct. 24, 2014); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015).  In making these credibility determinations, an ALJ should also consider a claimant's prior work history, particularly when that work history confirms a strong commitment to work in the past.  However, past work history, standing alone, is not determinative of a claimant's credibility.  Rather, "[p]ast work history is but one factor that may be used in analyzing a plaintiff's credibility."  Bermudez v. Colvin, No. 3:13-CV-0156, 2014 WL 4716510, at *10 (M.D. Pa. Sept. 22, 2014).

These same principles apply to an ALJ's credibility determinations as they relate to statements made by a claimant's family and friends, like the spouse report made in this case.  When evaluating such evidence "ALJs should consider 'such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence' when evaluating evidence from non-medical sources such as family or friends."  Zirnsak v. Colvin, 777 F.3d 607, 612 (3d Cir. 2014).  Moreover:

> To properly evaluate these factors, the ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility.  See Diaz v. Comm'r, 577 F.3d 500, 506 (3d

Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. <u>Adorno v. Shalala</u>, 40 F.3d 43, 48 (3d Cir.1994) (citing <u>Stewart v. Sec'y of Health, Education and Welfare,</u> 714 F.2d 287, 290 (3d Cir.1983)); <u>see also</u> <u>Stout v. Comm'r,</u> 454 F.3d 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony").

<u>Zirnsak v. Colvin</u>, 777 F.3d 607, 612 (3d Cir. 2014). Applying these benchmarks, it has been held that when an ALJ discounts a family member's disability report because it is inconsistent with clinical data, and may reflect a biased family perspective, substantial evidence supports that credibility determination and it may not be disturbed on appeal. <u>Id.</u>

**D. <u>Newly Discovered Evidence</u>**

Finally, in a case such as this where additional evidence is submitted by a plaintiff to the Appeals Council after the ALJ's decision, we must assess the relevance and import of that evidence under clearly defined rules. These rules provide that we cannot consider Appeals Council evidence in performing its substantial evidence review, since that review must be limited to the evidence presented to, and considered by, the ALJ. <u>See</u> <u>Matthews v. Apfel</u>, 239 F.3d 589, 593-95 (3d Cir. 2001). However, where the record reveals the existence of new evidence following the ALJ hearing, 42 U.S.C. § 405(g) provides that: "The court

34

may, . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." In exercising this authority, the United States Court of Appeals for the Third Circuit has emphasized that a claimant seeking remand on the basis of new evidence must demonstrate that the additional evidence is both new and material, and that the claimant had good cause for not submitting the evidence to the ALJ for his initial review. Szubak v. Sec'y of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). Where such criteria are met, the district court may enter what is colloquially referred to as a "sentence six" remand pursuant to the sixth sentence of 42 U.S.C. § 405(g).

In order for a claimant to prevail on a request for a sentence six remand, the evidence to be considered must first truly be "new evidence" and "not merely cumulative of what is already in the record." Szubak, 745 F.2d at 833. In this regard, "in order to be new, evidence must not be merely cumulative of what is already in the record. Szubak, 745 F.2d at 833. However, . . . the Third Circuit has allowed 'corroborating' evidence to constitute new evidence, id. at 834." Shuter v. Astrue, 537 F. Supp. 2d 752, 757 (E.D. Pa. 2008).

Second, the evidence must be "material", meaning that it must be "relevant and probative." Id. In making this determination, "the materiality standard of § 405(g) requires 'that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination.' Id. See also Booz v. Secretary of Health and Human Services, 734 F.2d 1378, 1381 (9th Cir.1984); Dorsey v. Heckler, 702 F.2d 597, 604–05 (5th Cir.1983); Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir.1981). Thus, to secure remand, a claimant must show that new evidence raises a 'reasonable possibility' of reversal sufficient to undermine confidence in the prior decision. The burden of such a showing is not great. A 'reasonable possibility,' while requiring more than a minimal showing, need not meet a preponderance test. Instead, it is adequate if the new evidence is material and there is a reasonable possibility that it is sufficient to warrant a different outcome." Newhouse v. Heckler, 753 F.2d 283, 287 (3d Cir. 1985). Further, "[a]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition. See Ward v. Schweiker, 686 F.2d 762, 765 (9th Cir.1982)." Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984).

In practice, "[f]our factors must be considered pursuant to this requirement. See, e.g., Newhouse v. Heckler, 753 F.2d 283, 287 (3d Cir.1985). First, the evidence must be new and not merely cumulative of what is already in the record. Id. at 287. Second, the evidence must be material, relevant and probative. Id. Third, there must exist a reasonable probability that the new evidence would have caused the Commissioner to reach a different conclusion. Id. Fourth, the claimant must show good cause as to why the evidence was not incorporated into the earlier administrative record. Id." Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 472 (3d Cir. 2005).

### E. Substantial Evidence Supports the ALJ's Determinations and Assessments in this Case

Judged against these legal benchmarks, we conclude that substantial evidence supports the finding made by the ALJ in this case. With respect to these findings, our review of the ALJ's decision is limited to determining whether the findings of the ALJ are supported by substantial evidence in the record. See 42 U.S.C. §405(g); 42 U.S.C. §1383(c)(3); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D.Pa. 2012). In this context, substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;" Pierce v. Underwood, 487 U.S. 552, 565

(1988), and substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). Guided by this deferential standard of review, we also recognize that, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' " Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). Therefore, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707.

In the instant case, we submit that the thorough opinion of the ALJ meets all of these benchmarks prescribed by law. The ALJ's decision carefully and comprehensively documented Huge's injuries, his reported activities of daily living, his medical treatment history, and the contrasting medical opinion evidence. (Tr. 53-60.) While the plaintiff has argued that much of the ALJ's opinion consisted of little more than a boilerplate recital, we disagree. Quite the contrary, we find that this opinion provided a factually specific and legally sufficient analysis of all of the factors that are relevant to a disability determination.

For example, to the extent that Huge argues on appeal that the ALJ erred in giving his subjective complaints and the reports submitted by his spouse only limited weight and credibility, we note "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir.1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.')." Frazier v. Apfel, No. 99-715, 2000 WL 288246, *9 (E.D. Pa. March 7, 2000). In this case, the ALJ discounted Huge's subjective complaints for multiple reasons, noting that: (1) they were inconsistent with emergency room records (Tr. 54-55, 292-94, 298, 308-09.); (2) they were inconsistent with Dr. Gold's clinical findings (Tr. 55, 323-25.); (3) they were not supported by the results of the March 2015 MRI of the cervical spine (Tr. 55, 361-62.); (4) they were inconsistent with Dr. Ahmed's clinical findings (Tr. 55-56, 335-38.); (5) they were not supported by the results of a November 2014 left hip x-ray (Tr. 59, 339.); (6) they were inconsistent with Dr. Coleman's psychological examination (Tr. 56, 353-57.); (7) they were inconsistent with Dr. Rabin's clinical findings (Tr. 56, 449.); (8) they were inconsistent with Dr. Zhang's clinical

39

findings (Tr. 57, 429.); (9) they were inconsistent with essentially normal primary care provider physical examination findings in June 2015 and August 2015, and a notation in August 2015 documenting improved depression (Tr. 57, 462, 466.); (10) they were inconsistent with Huge's activities of daily living (Tr. 51-52, 57.) (see above discussion); (11) they were inconsistent with Dr. Rohar's opinion (Tr. 57, 163-64, 168-69.); (12) they were inconsistent with Dr. Kamenar's opinion (Tr. 58, 164-67.); and (13) they were inconsistent with the fact that neither Dr. Rabin nor Dr. Zhang, examining neurosurgeons, recommended neck surgery. (Tr. 56-57.) This close and careful factual assessment provides substantial evidence to support this credibility determination, and it may not now be disturbed on appeal.

Similarly, the ALJ's decision to afford limited weight to the reports provided by Huge's spouse was based upon a finding that the reports were inconsistent with clinical data, and may reflect a biased family perspective, factors which the courts have found to be legitimate grounds for discounting such opinions. Zirnsak v. Colvin, 777 F.3d 607, 612 (3d Cir. 2014). Therefore, there was no error by the ALJ in the consideration of this evidence.

Huge also errs when he suggests that the ALJ ignored his past work history. Quite the contrary, the ALJ's decision acknowledged that work history while observing that Huge had not sought work outside his prior field of endeavor, arbor

40

work, following the alleged onset of his impairments. In doing so, the ALJ acted in accordance with settled law which recognizes that, "[p]ast work history is but one factor that may be used in analyzing a plaintiff's credibility." Bermudez v. Colvin, No. 3:13-CV-0156, 2014 WL 4716510, at *10 (M.D. Pa. Sept. 22, 2014).

The ALJ's assessment of the medical treatment and opinion evidence was also thorough, and balanced, and the conclusions reached by the ALJ drew support from substantial evidence in the record. Thus, the ALJ separately reviewed the treatment records of as many as nine treating sources, finding that these contemporaneous treatment records confirmed the existence of various impairments for Huge, but the treatment records, objective tests, and conservative course of treatment provided to Huge undermined his claim of total disability. Given this equivocal medical history, and the objective evidence which contradicted Huge's claim of total disability, the ALJ was justified in concluding that the opinions expressed by state agency physicians who found that Huge could perform some work were entitled to greater weight than other treating source opinions. In particular, with respect to the mental health professionals who opined regarding Huge's conditions, the ALJ was well-justified in giving greater weight to the acceptable medical source opinions of the consulting and examining doctors, over the opinion tendered by Mr. Boggia, who was not an acceptable medical

source, and whose opinions rested in part upon a factual error, the claim that Huge had experienced emotional trauma following a March 2014 auto accident. See Mack v. Astrue, 918 F. Supp. 2d 975, 982 (N.D. Cal. 2013).

Finally, to the extent that we are invited to remand this case based upon the evidence submitted to the Appeals Council following the ALJ's decision, we will decline this invitation. That evidence—which included treatment notes which stated that Huge was reconsidering any surgery for his carpel tunnel and cervical conditions and was operating a motorcycle—does not meet the criteria for a new evidence remand for at least three reasons. First, this evidence is not new but is merely cumulative of what is already in the record. Second, this evidence is not material, relevant and probative. Third, this evidence does not create a reasonable probability that the new evidence would have caused the Commissioner to reach a different conclusion. See Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 472 (3d Cir. 2005).

## III.    Conclusion

In sum, the ALJ's decision that Huge could perform a limited range of light work was supported by substantial evidence in the medical record, and the decision to deny benefits to Huge was thoroughly explained by the ALJ in the decision denying this second application for benefits. Therefore, we will affirm the

decision of the ALJ, direct that judgment be entered in favor of the defendant, and instruct the clerk to close this case.

An appropriate order follows.

So ordered this 22d day of September 2017.

*s/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge